# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**CASONDRA POLLREIS, on behalf of**                              **PLAINTIFF**
**herself and her minor children,**
**W.Y. and S.Y.**

**V.**                                    **CASE NO. 5:18-CV-5200**

**LAMONT MARZOLF and JOSH KIRMER,**
**in their individual capacities**                              **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Currently before the Court is a Motion for Summary Judgment (Doc. 20) filed by Defendants Lamont Marzolf and Josh Kirmer.[1]  Plaintiff Casonda Pollreis filed a Response in Opposition (Doc. 31), and Defendants then filed a Reply (Doc. 34).  For the reasons explained below, the Court **GRANTS IN PART AND DENIES IN PART** the Motion for Summary Judgment (Doc. 20).

### I. THE FACTS

W.Y. and S.Y., two boys ages 14 and 12, respectively, at the time of the incident at issue, were walking home one evening and were stopped by Springdale Police Officer Lamont Marzolf.  In the course of this stop, the boys were forced to lie facedown on the ground at gunpoint, and they were subsequently handcuffed and searched.  The boys and their mother, Ms. Pollreis, claim that Officer Marzolf and Officer Josh Kirmer, who was in communication with Officer Marzolf, violated their civil rights.

---

[1] As Defendants were police officers for the Springdale Police Department at all times relevant to this action, the Court refers to them as "Officer Marzolf" and "Officer Kirmer" throughout this Memorandum Opinion and Order.

The following facts are taken from a dashcam video, deposition testimony, and other uncontroverted evidence in the record. Officer Marzolf's dashcam captured the entire event, and facts from the dispatch transcript are also interspersed throughout the following narrative.

On January 8, 2018, Officer Kirmer responded to a tip that Jennifer Price, who had outstanding warrants, was staying with Tomas Silva at 2100 Lynn Street, in Springdale, Arkansas. (Doc. 22-1, p. 2). Mr. Silva was known to Officer Kirmer as a gang member and a prior suspect in cases involving guns and drugs. *Id.* During his surveillance of Mr. Silva, Officer Kirmer saw two males, one shorter and skinnier than the other, get into a Chevy Cobalt. *Id.* Officer Kirmer radioed this information to other officers in the area, and another officer tried to initiate a traffic stop of the Chevy Cobalt. *Id.* Mr. Silva fled and eventually wrecked the Chevy Cobalt. *Id.* Four occupants, including Mr. Silva, fled the disabled car; two went south and two went north. *Id.* at 3. Over the radio, Officer Kirmer requested that a perimeter be set up, and Officer Marzolf responded to this call. *Id.*

According to Officer Marzolf's dashcam,[2] he receives the dispatch call at time stamp 21:37:07.[3] He arrives at 40th Street and Luvene Avenue a minute and a half later. (21:38:30). Dispatch instructs Officer Marzolf to drive down to the intersection of Luvene and Lynn Street to watch for the suspects. (21:39:50). As Officer Marzolf approaches the intersection, someone announces over the radio that "the last time we made contact with

---

[2] Associated timestamps will be noted in parentheses.

[3] The video has two audio recordings associated with it; one from what appears to be a microphone on Officer Marzolf's body and another from inside his patrol car.

2

Tomas, he had a gun." (21:39:29). In response, Officer Marzolf says, "Shit." Someone asks over the radio, "Is he the one that's on foot?" Another officer responds, "Yeah, him and three others, one possibly a female by the name of Jennifer Price." (21:39:56).

Almost immediately after that, W.Y. and S.Y. become visible on the dashcam video. Officer Marzolf's blue lights are flashing. W.Y. and S.Y. are on the sidewalk on the east side of Lynn Street slowly walking side-by-side in the direction of Officer Marzolf's patrol car. They both are wearing hoodies and light colored pants. From Officer Marzolf's perspective, the boy on the left is larger and taller than the boy on the right. Officer Marzolf turns on his high beams and angles his car toward the boys. He stops the car and says, "Hey, what are you guys doing?" The larger boy, who was later identified as 14-year old W.Y., responds audibly and points past Officer Marzolf, but his response is not intelligible on the recording. Officer Marzolf then says, "Hey, stop, stop, turn away, turn away from me." (21:40:18). W.Y. and S.Y. stop and turn away from Officer Marzolf with their arms held out to their sides. At this point, Officer Marzolf enters the frame from the left with his firearm in his right hand pointed at the boys.

Officer Marzolf says, "What are your names?" (21:40:21). At the same time, Officer Marzolf pulls out his flashlight with his left hand and points it at the boys' backs. One of the boys (it is unclear which) audibly responds, and Officer Marzolf responds, "Huh?" The same boy, in a louder voice, clearly says his name. Officer Marzolf replies, "What?" The boy reiterates his name a third time. (21:40:27). Officer Marzolf audibly confirms the boy's name, and the boy responds, "Yes sir." Officer Marzolf holsters his flashlight, but his weapon remains drawn and pointed at the boys.

3

Next, Ms. Pollreis, who is off-screen, says, "Officer, officer, may I have a word with you?" (21:40:33). Officer Marzolf turns his head and looks behind him, and he lowers his firearm so that it is pointing at the ground. Ms. Pollreis continues speaking, but the recording does not clearly pick up what she is saying. Officer Marzolf then speaks into his radio, "45 Springdale, I've got [W.Y.] in front of me, I've got two juvenile individuals, dark hoodies and pants." Officer Kirmer responds, "Ok, detain both of those." (21:40:57). Officer Marzolf then says to Ms. Pollreis, "Yeah, I can hear you." (21:40:58). Ms. Pollreis can be heard speaking with Officer Marzolf, but her words are not clear on the recording. Officer Marzolf then radios, "10-9." Officer Kirmer responds, "Detain both of them. Is one taller than the other? The short one should be short and skinny." (21:41:08). Officer Marzolf responds, "10-4." (21:41:12). Officer Kirmer then says, "Yeah, hold onto them please." (21:41:15).

Officer Marzolf then approaches the boys and tells them to get on the ground. (21:41:14). His gun is drawn and pointed at them. They comply. Officer Marzolf says, "Put your hands out," and they put their arms out to their sides (21:41:16). Ms. Pollreis then enters the camera's view from the left, walking towards Officer Marzolf, and she says, "What happened?" (21:41:23). Officer Marzolf responds, "Hey, step back." (21:41:24). While taking a sideways step, she says, "They're my boys." (21:41:25). In a louder voice, Officer Marzolf says, "Get back." (21:41:26). He then steps towards her, his gun in his right hand still pointed at the boys on the ground. Ms. Pollreis says, "Are you serious?" Officer Marzolf responds, "I am serious, get back." At the same time, with his gun still pointed at the boys, he draws his taser with his left hand and points it at Ms. Pollreis (21:41:30). Ms. Pollreis then says, "It's OK, boys." (21:41:36). Officer Marzolf

4

holsters his taser but again commands Ms. Pollreis to "get back." (21:41:38). Ms. Pollreis says, "Where do you want me to go?" (21:41:38). He responds, "I want you to go back to your house." Ms. Pollreis retorts, "Are you serious? They're 12 and 14 years old." Officer Marzolf responds, "And I'm looking for two kids about this age right now, so get back in your house." Ms. Pollreis, who sounds upset, says, "Oh, my God. You're OK guys, I promise." According to the dispatch logs, around this time, Officer Patrick Gibbs states on the radio that one of the suspects "will be H/M blk hoodie blk jeans whi shoes med hair." (Doc. 22-1, p. 30).

For nearly two minutes, Officer Marzolf then stands over the boys with his gun pointed at them. (21:41:36–21:43:28). During these two minutes, he asks them if they have identification, and they respond in the negative. All the while, Officer Marzolf's gun appears to be pointed at the boys. Also during this two minute period, Officer Marzolf asks dispatch, "I've got my two on the ground here, can I have another unit?" He then tells dispatch, "I'm going to be about halfway down Lynn, off of Chapman."

Off-screen, the boys' stepfather can be heard to say, "Officer . . . can I have a word with you?" (21:43:29). Officer Marzolf answers, "No, not right now." The stepfather responds, "Those are my kids," and Officer Marzolf responds, "Ok." The stepfather explains, "We just left her parents' right there. When you guys passed with your lights on, they were walking behind my car. I also have witnesses if you want me to call them." Officer Marzolf responds, "That's fine, I just need to find out who these kids are right now." The stepfather states the boys' names, and Officer Marzolf verbally acknowledges that he heard the stepfather's statement. (21:44:01).

Officer Adrian Ruiz arrives, and he and Officer Marzolf walk towards the boys with guns drawn and pointed at the boys. (21:44:19). At the same time, one of the boys reaches back to adjust his shirt or belt, and Officer Marzolf says, "Hey, keep your hands out!" (21:44:19). At this time, dispatch records show that someone said, "Tomas and Jennifer are the only two left out[,] he is wearing a blu[e] jacket with maybe a gr[a]y hoodie under." (Doc. 22-1, p. 31). While Officer Ruiz continues to point his gun at the boys, Officer Marzolf holsters his weapon and tells W.Y. to "put his hands behind his back." (21:44:37). Officer Marzolf then handcuffs W.Y.'s hands behind his back. Officer Marzolf told dispatch, "I've got black hoodies and khaki pants and jeans." (21:44:43). Officer Ruiz, responds, "Black hoodie, and a white backpack . . . ." (21:44:50). Sergeant Franklin[4] arrives, and Officer Marzolf says to him, while pointing backwards past the patrol car, "Sarge, you got a parent back there." (21:44:55). Officer Marzolf also handcuffs the 12-year old S.Y.

Once the boys are handcuffed, Sergeant Franklin asks them if they were the ones who ran from the police. (21:44:56). They respond in the negative. Sergeant Franklin then asks, "What are you doing down here?" (21:44:58). One of the boys responds, "We were at our grandparents . . . and we just started walking home." (21:45:07). One of the officers says on his radio that "these are white kids on Lynn Street." (21:45:15). Sergeant Franklin then asks, "What are your names?" (21:45:11). The boys identify themselves. Officer Marzolf begins frisking W.Y. and searching his pant pockets. (21:45:23).

While Officer Marzolf searches W.Y., Sergeant Franklin asks Officer Marzolf, "Were they running?" (21:45:32). Officer Marzolf replies, "No, they were just walking, sir."

---

[4] Sergeant Franklin's first name is not part of the record.

(21:45:38). In response, Sergeant Franklin says, "Ok, so these guys probably aren't them?" (21:45:42). Officer Marzolf responds, "Probably not. I mean we had both parents come out . . . ." (21:45:45).

The boys' grandparents then approach and ask to speak with the officers. While the officers speak with the grandparents, Officer Ruiz searches S.Y.'s backpack. (21:46:09). After speaking with the grandparents, Sergeant Franklin orders the officers to remove the handcuffs and let the boys go. (21:46:21). According to the time stamps on the dashcam video, the entire encounter lasted approximately seven minutes.

At his deposition, Officer Marzolf explained why he stopped the boys:

What I'm telling you is that even though I was relayed a description of Hispanic, two Hispanic males, I'm not putting it out of the realm of possibilities as a police officer to be sitting on a perimeter and encounter two individuals that may not be the ethnic origin of what was initially relayed.

(Doc. 31-2, p. 15). Officer Marzolf also admitted that he "was going to stop any individuals along that area that I was working because that's what your job is on the perimeter." Id. He also explained that it was dark, it was raining, his lights were flashing, and the boys had hoods over their heads because of the rain. Id. at 6.[6] He concedes that he never saw the boys run, and they did not seem like they were out of breath. Id. Officer Marzolf further testified that the description of the suspects he received was that one of the suspects was taller and bigger than the other. Id. at 14. He also states that, at that time, he understood that at least one of the suspects, Tomas Silva, was a Hispanic male. Id. at 15.

---

[6] The dashcam video shows that only S.Y. had his hood over his head.

Officer Marzolf testified that he drew his gun because "[i]t was relayed over the radio that one of the individuals that we were looking for was known to carry a handgun." *Id.* at 6.[7] Officer Marzolf justified his decision to continue the stop of the boys because he was told by Officer Kirmer to detain them. *Id.* at 8.

As for his decision to draw his Taser on Ms. Pollreis, he testified that she initially approached him and informed him that the boys were her children. *Id.* He asserts that Ms. Pollreis disobeyed his verbal commands and advanced on him in a "high threat situation." *Id.* He claims that he did not know if "she's part of all this or what the situation is . . . ." *Id.*

Pursuant to 42 U.S.C. § 1983, Ms. Pollreis, on behalf of her children, asserts four claims against Officer Marzolf and Officer Kirmer in their individual capacities: illegal seizure; illegal arrest and detention; illegal search; and excessive use of force. On her own behalf, Ms. Pollreis also brings a § 1983 claim for excessive force against Officer Marzolf and Officer Kirmer in their individual capacities. Defendants seek dismissal of these claims because the real parties in interest have not been joined to this action. Officer Marzolf also contends that all of his actions towards Ms. Pollreis and her children were objectively reasonable and should be dismissed as a matter of law. As for Officer Kirmer, he argues that all of the claims against him fail because he was not personally involved in and did not have responsibility for any of the alleged constitutional violations. Officer Marzolf and Officer Kirmer also contend that they are entitled to qualified immunity against Plaintiff's claims.

---

[7] Officer Marzolf also notes that ammunition was found by other officers, but the record indicates that the ammunition was found after the boys had been released.

## II. LEGAL STANDARD

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l. Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602, 606 (8th Cir. 1999).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). However, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, in order for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). To meet its burden, "[t]he nonmoving party must do more than rely on allegations or denials in the pleadings, and

the court should grant summary judgment if any essential element of the prima facie case is not supported by specific facts sufficient to raise a genuine issue for trial." *Register v. Honeywell Fed. Mfg. & Techs., LLC*, 397 F.3d 1130, 1136 (8th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## B. Qualified Immunity

When a government official, such as a police officer, is accused of violating an individual's constitutional rights, qualified immunity will shield that government official from liability unless his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U:S. 800, 818 (1982). This is a two-step inquiry. In order for a plaintiff to overcome an officer's defense of qualified immunity, he must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009). "Whether an officer is entitled to qualified immunity because he 'acted reasonably under settled law in the circumstances' is a question of law for the court, both before and after trial." *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

"For a right to be deemed clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Buckley v. Rogerson*, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The question is whether the law gave the officials 'fair warning that their alleged conduct was unconstitutional.'" *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009) (quoting *Brown v. Fortner*, 518 F.3d 552, 561 (8th Cir.

2008)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

When assessing qualified immunity at the summary judgment stage, the Court must grant the nonmoving party "the benefit of all relevant inferences." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (quoting *Plemmons v. Roberts*, 439 F.3d 818, 822 (8th Cir. 2006)). "[I]f there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Id.* (quoting *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001)) (internal quotation omitted).

## III. DISCUSSION

This Opinion is organized in the following manner. First, the Court discusses whether the claims are properly brought by W.Y. and S.Y.'s representative and next friend. Second, the Court addresses the illegal seizure, illegal arrest, illegal search, and excessive force claims against Officer Marzolf. For most of these claims, the Court first addresses whether there is a genuine issue of material fact in dispute on the merits of the claim. If Officer Marzolf is entitled to summary judgment on the merits of the claim, the Court does not discuss qualified immunity on that claim. If, on the other hand, summary judgment is not appropriate on the merits of a particular claim, the Court addresses whether Officer Marzolf is entitled to qualified immunity on that claim. The only exception to this format may be found in the discussion of Ms. Pollreis's excessive force claim against Officer Marzolf; there, the Court jumps directly to the issue of qualified immunity. Finally, the Court discusses the claims against Officer Kirmer.

## A. Real Party In Interest

Defendants argue that the claims of W.Y. and S.Y. should be dismissed for failure to prosecute in the name of a real party in interest. According to Defendants, Federal Rule of Civil Procedure 17 requires that minors sue through their next friend or guardian *ad litem*, and since Ms. Pollreis is proceeding as neither, the claims she brings on the boys' behalf should be dismissed. Ms. Pollreis argues that Defendants waived this argument by failing to raise it in their answer.

It is clear to the Court that Ms. Pollreis is bringing W.Y. and S.Y.'s claims in her representative capacity and as their mother and next friend. Defendants' argument places form over obvious substance. Accordingly, the Court finds that the claims of the real parties in interest are properly before the Court.

## B. Claims Against Officer Marzolf

### 1. Illegal Seizure

Ms. Pollreis argues that Officer Marzolf illegally seized W.Y. and S.Y. by "stopping [their] freedom of movement and keeping them stopped for an unnecessarily excessive amount of time." (Doc. 1, ¶ 28). In other words, it is alleged that the children were subject to an unlawful investigatory stop, commonly referred to as a "*Terry*" stop. *Terry v. Ohio*, 392 U.S. 1 (1968).

The Eighth Circuit has identified three "noncontroversial and well-established principles" regarding *Terry* stops:

> First, the scope of an investigatory detention under [*Terry*] is limited. While an officer may conduct a limited, warrantless search of a suspect if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous, the scope of such a search must be confined to a search reasonably designed to discover concealed weapons. The sole justification for such a search is the protection of the officer and others.

> Because of the limited scope of an investigatory detention under *Terry*, officers must use the least intrusive means that are reasonably necessary to protect officer safety.
>
> Second, where an officer exceeds the permissible scope of *Terry*, the investigatory detention is transformed into an arrest.
>
> Third, a *Terry* stop that becomes an arrest must be supported by probable cause.

*United States v. Aquino*, 674 F.3d 918, 923–24 (8th Cir. 2012) (cleaned up). The "reasonable suspicion" necessary to justify a *Terry* stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). "The standard takes into account 'the totality of the circumstances—the whole picture.'" *Navarette*, 572 U.S. at 397 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). The Eighth Circuit has held that "[w]hile a person's mere presence in a suspicious location does not, in and of itself, justify a *Terry* stop, *Johnson v. Phillips*, 664 F.3d 232, 237 (8th Cir. 2011), the court is to 'determine whether the facts *collectively* provide a basis for reasonable suspicion.'" *Clark v. Clark*, 926 F.3d 972, 978 (8th Cir. 2019) (quoting *United States v. Stewart*, 631 F.3d 453, 457 (8th Cir. 2011). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy,* 46 F.3d 1427, 1429 (8th Cir.1995). On the other hand, "a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (quoting *United States v. Juvenile TK,* 134 F.3d 899, 903–04 (8th Cir.1998)).

Additionally, while executing an investigatory stop, officers are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). "To establish an unreasonably prolonged detention, the [complaining party] must show that the officer detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion." *United States v. Donnelly*, 475 F.3d 946, 951–52 (8th Cir. 2007).

Here, the parties do not dispute that W.Y. and S.Y. were seized within the meaning of the Fourth Amendment. The question, therefore, is twofold: (1) whether the initial seizure was supported by reasonable suspicion and (2) whether the prolonged seizure was of reasonable length and supported by reasonable suspicion. The Court will address each of these claims in turn.

#### i. The Initial Seizure

Applying the above principles to the undisputed facts, the Court concludes that there are no genuine disputes of material fact as to whether Officer Marzolf's initial stop of W.Y. and S.Y. was supported by a reasonable suspicion. The following factors supported Officer Marzolf's initial decision to stop W.Y. and S.Y.:

1. an ongoing crime—dispatch alerted Officer Marzolf that four suspects were currently fleeing from police, three of whom were male;

2. threat level—dispatch alerted Officer Marzolf that one of the male suspects was known to carry a firearm;

3. the location—Officer Marzolf encountered W.Y. and S.Y. in relatively close proximity to the location where the suspects were last seen;

4. the visibility—it was nighttime, and it was raining.

14

The following factors, however, did not support Officer Marzolf's decision to stop W.Y. and S.Y.:

1.  demeanor—W.Y. and S.Y. were calmly walking on a sidewalk in the direction of Officer Marzolf's patrol car, which had its blue lights activated, when he stopped them;

2.  residential neighborhood—there is no evidence that W.Y. and S.Y. were in a high-crime area or that it was odd for W.Y. and S.Y. to be outside at that time.

More difficult to weigh is whether W.Y. and S.Y. met the vague description of the suspects. Depending on the circumstances, the Eighth Circuit allows *Terry* stops when a detainee is an inexact match with a vague description of a suspect. *See Quinn*, 812 F.3d at 699 (holding that an officer's stop of an individual that was an imperfect match with the description of a suspect was excused "due to the lack of other pedestrians within the perimeter" and because the individual reacted suspiciously); *United States v. Witt*, 494 F. App'x 713, 716 (8th Cir. 2012) (unpublished per curiam) (finding stop of a green station wagon was supported by reasonable suspicion where suspect was believed to be driving a "dark green or black station wagon" since traffic was light and the detainee was the only person driving a station wagon); *Juvenile TK*, 134 F.3d at 903–04 (holding that, despite a vague description, an officer had reasonable suspicion to stop an individual due to the lack of other vehicles in the area at the time).

The undisputed facts show that dispatch alerted Officer Marzolf that at least three of the suspects were males and one a female. Thus, a reasonable officer in Officer Marzolf's shoes could have believed that W.Y. and S.Y. (who were clearly male) met the description of two of the suspects. Given the relative physical and temporal proximity to the site where the suspects fled and where Officer Marzolf encountered W.Y. and S.Y.,

15

as well as the fact that there were no other observable pedestrians, the Court concludes that Officer Marzolf had reasonable suspicion to stop W.Y. and S.Y. Accordingly, Officer Marzolf is entitled to summary judgment on this claim.

## ii. The Prolonged Seizure

The Court next turns to assess Officer Marzolf's decision to prolong the seizure of W.Y. and S.Y. Taking the undisputed facts in the light most favorable to Plaintiff, the Court concludes that a genuine issue of material fact remains in dispute as to whether Officer Marzolf's prolonged seizure of W.Y. and S.Y. was supported by reasonable suspicion. "The police [are] required to act with diligence and to take reasonable steps to confirm or dispel their suspicions in a timely manner." *Seymour v. City of Des Moines*, 519 F.3d 790, 799 (8th Cir. 2008) (citation omitted). "To establish an unreasonably prolonged detention, the defendant must show that the officer detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion." *Donnelly*, 475 F.3d at 951–52 (citations omitted).

Viewing the undisputed evidence in the light most favorable to W.Y. and S.Y., the Court concludes that the objective facts that came to light *after* the initial stop did not support a reasonable suspicion that W.Y. and S.Y. were the fleeing suspects. First, W.Y. and S.Y.'s behavior after the initial stop did not give rise to a reasonable suspicion that they had just committed a crime: they were not out of breath, they did not act suspiciously, and they were entirely compliant with Officer Marzolf's commands. Second, almost immediately after the boys were stopped by Officer Marzolf, Ms. Pollreis identified herself as the mother of W.Y. and S.Y. Instead of questioning her, Officer Marzolf directed her to return to her home. For the next two minutes, Officer Marzolf's only attempt to confirm

16

or dispel his suspicions was to ask the young boys if they had identification. Next, the boys' stepfather approached Officer Marzolf and informed him that the boys had just been at their grandparents' house. After the stepfather spoke to Officer Marzolf, Officer Marzolf continued to point his firearm at the boys while they lay facedown on the ground.

The only evidence that supports Officer Marzolf's decision to continue detaining the boys is the fact that they partially matched a vague description provided by Officer Kirmer.[8] Specifically, Officer Kirmer informed Officer Marzolf that one of the suspects would be taller and skinner than the other; the boys are indeed different sizes. As previously discussed, the Eighth Circuit has held that "generic suspect descriptions and crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description." Quinn, 812 F.3d at 699. But all of the other evidence that came to light while the boys were detained suggested that they were not the fleeing suspects. Indeed, once he learned the boys' names and had received corroboration from Ms. Pollreis and the boys' stepfather, Officer Marzolf knew that neither of the boys was Mr. Silva.[9] This makes Officer Marzolf's extension of the detention even less excusable: Once he knew that neither of the boys was Mr. Silva and that they had just been at their grandparents' house, he no longer had any reason to believe that either of the boys was armed or dangerous, and he should have swiftly ended

---

[8] The parties shed considerable ink in their briefing about the ethnicity of the boys and the suspects. But none of the dispatch logs indicate that Officer Marzolf knew, at the time he stopped the boys, that all of the suspects were Hispanic.

[9] Officer Marzolf did testify that he believed Mr. Silva was Hispanic, which further lessens his reasonable suspicions for believing that the boys—who appear to be Caucasian on the dashcam video—were armed and dangerous.

17

the stop. In other words, by the time the 12 and 14-year old boys' stepfather verified their identities and provided a very logical alibi, no reasonable officer would have believed that the boys were the fleeing suspects. The Court concludes that there is a genuine issue of material fact as to whether Officer Marzolf's prolonged seizure of the boys was supported by reasonable suspicion.[10]

The Court turns to address Officer Marzolf's argument that his actions are excused because Officer Kirmer directed him to detain the boys. Officer Marzolf does not point the Court to any case law that suggests a supervising officer's command necessarily excuses a subordinate's unconstitutional acts.[11] Instead, as always, the Court must determine whether reasonable suspicion existed "by looking to what the officer reasonably knew at the time." *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012) (quoting *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999)). A reasonable

---

[10] It is true that the Eighth Circuit has upheld *Terry* stops even when the police continue an investigation after determining that a detained individual is not the sought suspect. But in such cases, there are additional facts that created a separate reasonable suspicion in the mind of the investigating officer. *See, e.g., United States v. Meier*, 759 F. App'x 523, 532 (8th Cir. 2019) (unpublished per curiam). (holding that the suspect admitted to facts that suggested he was indeed the cause of a second 911 call). Here, once it became clear that the boys were not the fleeing suspects, there were no other grounds for detaining them.

[11] In their Reply, Defendants argue that, under the "collective knowledge" theory, the Court should assume Officer Marzolf knew everything Officer Kirmer knew. While it is true that the Eighth Circuit has allowed searches to be based on collective knowledge of investigating officers when there "is some degree of communication," *United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011), the facts known only to Officer Marzolf as a result of his presence at the scene of the stop abrogated any reasonable suspicion or probable cause, regardless of Officer Kirmer's instruction or what Officer Kirmer knew. Indeed, even if all of the facts known to Officer Kirmer had been communicated to Officer Marzolf—such as a more detailed description of the suspects—Officer Marzolf's justification for stopping the boys would have been weakened, not strengthened.

18

officer in Officer Marzolf's shoes would have known that Officer Kirmer was ignorant of the following crucial facts: (1) the boys were not running or out of breath; (2) the boys had not been acting suspiciously; (3) the boys immediately complied with all commands; (4) the boys' parents had verified the boys' identities and provided alibis; and (5) the boys appeared to be the ages stated by their parents. Officer Marzolf was the only individual in possession of these facts, and he failed to communicate any of them to Officer Kirmer. Thus, a reasonable officer in Officer Marzolf's shoes would have either communicated those facts to Officer Kirmer or taken those facts into account when determining whether to prolong the seizure of the boys. [12]

The Court next turns to address whether Officer Marzolf is entitled to qualified immunity on the prolonged seizure claim. The Court concludes that he is not. Even if an officer conducts an unlawful stop, that officer "may nonetheless be entitled to qualified immunity if she had *arguable* reasonable suspicion—that is, if a reasonable officer in the same position could have believed she had reasonable suspicion." *Waters v. Madson*, 921 F.3d 725, 736 (8th Cir. 2019) (citing *De La Rosa v. White*, 852 F.3d 740, 744 (8th Cir. 2017)). The "arguable reasonable suspicion" test is another way of saying that a plaintiff must establish the "clearly established" prong of qualified immunity. *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459 (8th Cir. 2011). It was well known at the time of this

---

[12] While the Court understands that the permissibility of a *Terry* stop is focused on what was objectively reasonable, the Court also notes the subjective observations of the officers on the scene. When Sergeant Franklin arrived on the scene, his first question to Officer Marzolf was, "Were they running?" Officer Marzolf replied, "No, they were just walking, sir." In response, Sergeant Franklin said, "Ok, so these guys probably aren't them?" Officer Marzolf: "Probably not. I mean we had both parents come out." These remarks suggest that a reasonable officer in Officer Marzolf's shoes would not have believed that W.Y. and S.Y. were the fleeing suspects.

incident that a *Terry* stop is only valid if "police officers have a reasonable and articulable suspicion that criminal activity may be afoot." *Johnson*, 664 F.3d at 237 (quoting *Navarret-Barron*, 192 F.3d at 790). Viewing the facts in the light most favorable to W.Y. and S.Y., after W.Y.'s and S.Y.'s stepfather offered additional corroboration of the boys' identities and alibis, no officer in Officer Marzolf's shoes would have reasonably suspected that the boys were the fleeing suspects. Accordingly, the Court concludes that Officer Marzolf is not entitled to qualified immunity on the prolonged seizure claim.

## 2. Illegal Arrest

The Court next turns to the claim that Officer Marzolf violated the Fourth Amendment by illegally arresting W.Y. and S.Y. If the investigatory detention of the boys exceeded the scope of a *Terry* stop, then the stop would become a *de facto* arrest that must be supported by probable cause. "An officer possesses probable cause to effectuate a warrantless arrest 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Thurairajah v. City of Fort Smith, Ark.*, 925 F.3d 979, 983 (8th Cir. 2019) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) (internal quotation omitted)). To the extent the stop of the boys became a *de facto* arrest, the question of whether there was probable cause can be dispensed with quickly: Since there is a genuine question of material fact as to whether there was a reasonable suspicion to prolong the stop of the boys after their parents intervened, the Court concludes that there must also be a genuine question of material fact as to whether probable cause supported Officer Marzolf's arrest of the boys. Thus, the only issue remaining is whether the stop became a *de facto* arrest at any point.

20

The Court finds that a genuine issue of material fact exists as to whether W.Y.'s and S.Y.'s detention was a *de facto* arrest supported by probable cause. "[A]n action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir. 1992) (citation and quotation marks omitted). The Eighth Circuit has recently noted that the line between an investigatory stop and an arrest "can be hazy." *Chestnut v. Wallace*, 2020 WL 360458, at \*2 (8th Cir. Jan. 21, 2020). "An investigative detention may turn into an arrest if it lasts for an unreasonably long time or if officers use unreasonable force." *U.S. v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006) (quoting *Maltais*, 403 F.3d at 556 (internal quotations omitted)).

Factors to consider in determining whether an investigative stop is elevated into an arrest include:

> 1) the number of officers and police cars involved; 2) the nature of the crime and whether there is reason to believe the suspect might be armed; 3) the strength of the officers' articulable, objective suspicions; 4) the erratic behavior of or suspicious movements by the persons under observation; and 5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*Raino*, 980 F.2d. at 1149–50.

"[H]andcuffs are a hallmark of formal arrest," but "[t]he use of handcuffs does not *always* convert an investigative stop into an arrest. *El-Ghazzawy v. Berthiaume*, 708 F. Supp. 2d 874, 882 (D. Minn. 2010) (emphasis in original) (quotations and citations omitted), *aff'd* 636 F.3d 452 (8th Cir. 2011). "[F]or the use of handcuffs during a *Terry* stop, the Fourth Amendment requires some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose." *El-Ghazzawy*, 636 F.3d at 457 (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 836

(6th Cir. 2005)). Further, "[i]t is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) (citations omitted).

In *El-Ghazzawy*, the Eighth Circuit held that a *de facto* arrest occurred where a police officer handcuffed a man suspected of selling counterfeit watches because: (1) the officer had no indication that the man was dangerous; (2) the suspected crime did not involve a weapon; (3) the man did not act suspiciously; (4) the officer failed to conduct any investigation before handcuffing the suspect; and (5) there were no exigent circumstances. 636 F.3d at 457–58. On the other hand, in *Waters*, the Eighth Circuit found that handcuffing an individual and placing him in a squad car for 20 minutes was not a *de facto* arrest. 921 F.3d at 737. The individual refused to allow store employees to verify his purchase at a lumberyard, and he failed to identify himself to police officers or comply with their instructions to step out of his vehicle. *Id.* The Eighth Circuit held that this detention was not an arrest because of the individual's suspicious behavior and because the individual was larger than the police officers who were present. *Id.* In a third case, *Chestnut*, the court found no *de facto* arrest where the plaintiff—Wallace—when asked for identification by a police officer, provided his birthdate and declined to provide his full social security number. 2020 WL 360458, at *1. He was then frisked for weapons but none were found, and then he was placed in handcuffs. *Id.* After approximately twenty minutes, the handcuffs were removed. *Id.* Comparing these facts with *Waters*, the Eighth Circuit concluded that Wallace had not been arrested given that the plaintiff in

22

*Waters* had undergone an "arguably more intrusive" interaction that was not considered an arrest. *Id.* at *2.

For the following reasons, the Court concludes that a material issue of fact remains in dispute as to whether W.Y.'s and S.Y.'s detention was transformed into a *de facto* arrest. First, while W.Y.'s and S.Y.'s detention was shorter than the twenty-minute detentions described in *Waters* and *Chestnut*, their interaction with the police was considerably more intense: The 12 and 14-year old boys were handcuffed and held at gunpoint while laying facedown on the ground and surrounded by police officers. Second, at the time W.Y. and S.Y. were handcuffed by Officer Marzolf, given the boys' compliance with prior commands, no reasonable officer in Officer Marzolf's shoes would have believed that they were armed or dangerous or that handcuffing them was necessary to maintain the *status quo*. Third, as discussed above, Officer Marzolf's objective, articulable suspicion that the boys had committed a crime had evaporated by the time the boys were handcuffed because the boys' parents had already corroborated their identities and alibis. Fourth, while there was reasonably an immediate need to stop and question the boys when they might have been fleeing suspects, given their compliance and the information provided by their parents, no reasonable officer would have believed that handcuffing the boys at gunpoint was the least intrusive means necessary to conduct the stop.

Considering the totality of the circumstances, the Court concludes that Officer Marzolf's conduct—handcuffing two boys laying facedown on the ground, at gunpoint, given the considerable evidence that the boys were not the fleeing suspects—was more intrusive than necessary for an investigative stop. Since Officer Marzolf's detention of the

23

boys was far more intrusive than necessary to confirm or dispel his initial reasonable suspicions, the Court concludes that a reasonable jury could conclude that Officer Marzolf arrested W.Y. and S.Y.

The Court next turns to whether Officer Marzolf is entitled to qualified immunity on the illegal arrest claim. The Court finds that he is not. "[A]n officer is entitled to qualified immunity [for a warrantless arrest] if there is at least 'arguable probable cause.'" *Thurairajah*, 925 F.3d at 983 (quoting *Borgman*, 646 F.3d at 522–23) (other citations omitted). Arguable probable cause exists if a warrantless arrest is "based on an objectively reasonable—even if mistaken—belief that the arrest was based in probable cause." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013). Viewing all of the facts discussed above in the light most favorable to W.Y. and S.Y., after W.Y.'s and S.Y.'s stepfather offered additional corroboration of the boys' identities and alibis, no reasonable officer in Officer Marzolf's shoes would have believed that the boys were the fleeing suspects. Officer Marzolf lacked even arguable probable cause for the arrest. Accordingly, the Court concludes that Officer Marzolf is not entitled to qualified immunity on the illegal arrest claim.

## 3. Illegal Search

The Court next turns to the claim that Officer Marzolf violated the Fourth Amendment by illegally searching W.Y. and S.Y. Warrantless searches are *per se* unreasonable under the Fourth Amendment unless a recognized exception applies. *Riley v. California*, 573 U.S. 373, 382 (2014) (citation omitted). One such exception applies during *Terry* stops: Police officers, assuming they have reasonable suspicion that a crime is being, has been, or will be committed, are permitted to frisk a detained person for

weapons, so long as the officer has an articulable suspicion that the person is armed and a danger to the safety of officers or others. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *United States v. Davidson*, 808 F.3d 325, 329 (8th Cir. 2015). Additionally, a warrantless search of an arrestee is permitted if the search is "incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). If, however, an arrest is *unlawful*, then the search incident to arrest is invalid. *See United States. v. Chartier*, 772 F.3d 539, 545 (8th Cir. 2014).

W.Y. and S.Y. argue that they were illegally searched because they were handcuffed and then searched. The dashcam video depicts three distinct searches: (1) the frisk of W.Y.; (2) the frisk of S.Y.; and (3) the search of S.Y.'s backpack. The Court denies summary judgment on the claim based upon the frisk of W.Y. but grants summary judgment on the claims for the frisk of S.Y. and the search of S.Y.'s backpack.

#### i. The Frisk of W.Y.

The Court finds there is a genuine issue of material fact in dispute as to whether the frisk of W.Y. was legal. As discussed above, the Court has concluded that, at the point the boys were handcuffed, there is a genuine issue of material fact in dispute as to whether a *de facto* arrest occurred and whether such a *de facto* arrest was supported by probable cause. The dashcam video shows that Officer Marzolf frisked W.Y. *after* he was handcuffed; thus, if the jury concludes that the *de facto* arrest was not supported by probable cause, then they would have to conclude that the frisk of W.Y. was not a lawful search incident to arrest. *See Chartier*, 772 F.3d at 545. Accordingly, the Court concludes that there is a genuine issue of material fact as to whether Officer Marzolf's search of W.Y. was a permissible warrantless search.

Furthermore, even if the search were incident to a permissible *Terry* stop and not a *de facto* arrest, there remains a genuine issue of material fact as to whether Officer Marzolf's search was permissible as part of a *Terry* stop. Under *Terry*, an officer who reasonably suspects that the persons being investigated are armed and dangerous to "conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." *Terry*, 392 U.S. at 30. Such a frisk "requires more than an officer's inchoate and unparticularized suspicion or hunch." *United States v. Woods*, 747 F.3d 552, 555 (8th Cir. 2014) (internal quotations and citations omitted). But, as the Court has already discussed, by the time Officer Marzolf handcuffed and frisked W.Y. and S.Y., any reasonable suspicion that they had committed a crime had dissipated, and Officer Marzolf had been repeatedly informed by the young boys' parents that neither of them was the suspect who was known to carry a gun. Additionally, the boys had been completely compliant with Officer Marzolf's commands, and there was no other indication that they were armed and dangerous at the time W.Y. was frisked. Accordingly, viewing the undisputed record evidence in the light most favorable to W.Y. and S.Y., the Court concludes that no reasonable officer would have suspected that W.Y. and S.Y. were armed and dangerous, and therefore Officer Marzolf's frisk was not supported by reasonable suspicion.

The Court now turns to discuss whether Officer Marzolf is entitled to qualified immunity for the frisk of W.Y. The Court concludes that he is not. To determine whether Officer Marzolf is entitled to qualified immunity on this illegal search claim, the Court must assess whether arguable probable cause or arguable reasonable suspicion justified the search. *See Waters*, 921 F.3d at 736 (holding that arguable reasonable suspicion is the

standard for qualified immunity during *Terry* stop searches); *Schaffer v. Beringer*, 842 F.3d 585, 592 (8th Cir. 2016) (holding that arguable probable cause is the standard for qualified immunity during searches incident to arrest). As discussed at length above, viewing the facts in the light most favorable to W.Y., by the time Officer Marzolf frisked W.Y. there were no facts that provided arguable probable cause or arguable reasonable suspicion that W.Y. had committed a crime or that he was armed and dangerous. Accordingly, Officer Marzolf is not entitled to qualified immunity on this claim.

### ii. The Frisk of S.Y. and the Backpack Search

-The Court grants summary judgment on the claim that Officer Marzolf illegally frisked S.Y. and searched S.Y.'s backpack. For a governmental official to be held liable under § 1983 in their individual capacity, that official must have directly participated in the unconstitutional acts. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010). The dashcam video reveals that Officer Marzolf did not frisk S.Y. or search his backpack; instead, it appears that Officer Ruiz performed those acts. Further, there is no evidence that Officer Marzolf ordered Officer Ruiz to search S.Y. or his backpack. Accordingly, since Officer Marzolf did not directly participate in those allegedly unconstitutional acts, the Court grants Officer Marzolf summary judgment on the claims for the frisk of S.Y. and his backpack.

### 4. Use of Excessive Force Against W.Y. and S.Y.

W.Y. and S.Y. argue that Officer Marzolf used excessive force against them by repeatedly pointing his firearm at them. Officer Marzolf argues that he did not use excessive force against W.Y. and S.Y. because he gave no indication that he intended to fire his gun.

27

The Court finds that there remains a genuine, material question of fact as to whether Officer Marzolf used excessive force against W.Y. and S.Y. The Eighth Circuit has found that pointing a firearm at an individual may, depending upon the totality of the circumstances, constitute use of excessive force. *Compare Clark*, 926 F.3d at 979 (holding that it was not an excessive use of force to point a gun at an armed suspect who had not yet been "removed from the vehicle, patted down, and restrained"), *with Wilson v. Lamp*, 901 F.3d 981, 990 (8th Cir. 2018) (finding that officers used excessive force by keeping weapons drawn and pointed at suspects after they realized that they had the wrong individual and had patted him down).

Here, the dashcam video shows that Officer Marzolf had his service weapon drawn and pointed at W.Y. and S.Y. at multiple points from the very beginning of the encounter until the 21:44:25 mark on the dashcam video. Yet, for most of this encounter, the boys were lying facedown on the ground with their arms spread out to the side. They were compliant with Officer Marzolf's commands throughout the entire encounter. Officer Marzolf's assertion that his gun was pointed at the ground is belied by the video evidence. Further, while dispatch warned Officer Marzolf that Mr. Silva was possibly armed and dangerous, Officer Marzolf *continued* to point his firearm at W.Y. and S.Y. even after learning that the boys were 12 and 14 years old and had been walking home from their grandparents' house. Viewing these facts in the light most favorable to W.Y. and S.Y. and considering the amount of force used by Officer Marzolf against two compliant suspects, the Court believes a reasonable jury could conclude that Officer Marzolf used excessive force against W.Y. and S.Y.

The Court next turns to the question of whether Officer Marzolf is entitled to qualified immunity on this excessive force claim. The Court concludes that he is not. "The right to be free from excessive force in the context of an arrest is a clearly established right under the Fourth Amendment's prohibition against unreasonable seizures." *Ngo v. Storlie*, 495 F.3d 597, 604 (8th Cir. 2007) (quoting *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006)). "In order for the right to be clearly established, 'existing precedent must have placed the constitutional question beyond debate' so that 'a reasonable official would understand that what he is doing violates that right.'" *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1012 (8th Cir. 2017) (quoting *Hollingsworth v. City of St. Ann*, 800 F.3d 985, 989 (8th Cir. 2015)).

The Eighth Circuit has held that the right not to have a gun pointed at a compliant suspect was clearly established by at least February 2016, well before this encounter took place. *Rochelle v. City of Springdale Police Dep't*, 768 F. App'x 588, 590 (8th Cir. 2019) (citing *Thompson v. City of Monticello*, 894 F.3d 993, 990 (8th Cir. 2018)). Summary judgment is therefore denied as to this excessive-force claim.

### 5. Use of Excessive Force Against Ms. Pollreis

Ms. Pollreis asserts that Officer Marzolf used excessive force by drawing and pointing his taser at her. Officer Marzolf argues that, due to Ms. Pollreis' "repeated noncompliance with his commands," pointing his taser at her was objectively reasonable under the circumstances.

For the following reasons, the Court concludes that Officer Marzolf is entitled to qualified immunity on this claim. While the Eighth Circuit has not decided whether the act of drawing a taser and pointing it at an individual, without firing it, constitutes an excessive

use of force, several district courts have addressed this very issue. In *Policky v. City of Seward, Neb.*, the district court concluded that an officer's act of drawing and pointing a taser gun did not constitute use of excessive force. 433 F. Supp. 2d 1013, 1025 (D. Neb. 2006). Similarly, in *Price v. Busbee*, 2006 WL 435670, at \*3 (M.D. Ga. Feb. 21, 2006), the district court concluded that it was not an excessive use of force to threaten the use of a taser since the threat was "used in a good faith attempt to restore discipline." The district court did note that "an excessive force claim for immediate, malicious threat of electrical shock would not be indisputably meritless." *Id.* (quoting *Bilal v. Driver*, 251 F.3d 1346, 1349 (11th Cir. 2001)); *see Parker v. Asher*, 701 F. Supp. 192, 195 (D. Nev. 1988) (holding that "guards cannot aim their taser guns at inmates for the malicious purpose of inflicting gratuitous fear").

This Court previously held that aiming a taser at a suspect for no legitimate purpose was not a violation of clearly established law. *Brown v. Boone Cnty.*, 2014 WL 4405433, at \*4 (W.D. Ark. Sept. 5, 2014). This Court noted that "existing law within the Eighth Circuit did not put [the officer] on notice that the mere drawing and pointing of the taser constituted excessive force" and that "[n]o such constitutional violation has been clearly established in this jurisdiction." *Id.* This Court believes the state of the law in the Eighth Circuit on the threatened use of a taser is essentially the same as it was at the time of this Court's decision in *Brown*. It is true that the Eighth Circuit has developed its case law regarding the threatened use of *firearms*, but there have been no such developments surrounding the threatened use of tasers.

Here, the undisputed evidence shows that Officer Marzolf drew and pointed his taser at Ms. Pollreis *after* he had twice commanded her to step back. There is nothing in

the record to suggest that Officer Marzolf pointed his taser at Ms. Pollreis for a malicious purpose, or even for no purpose. Instead, Officer Marzolf pointed his taser at Ms. Pollreis in order to enforce his command, misguided though that command may have been. Ms. Pollreis has failed to point to cases of controlling authority in this jurisdiction at the time of the incident that would have provided a "fair and clear warning" to Officer Marzolf that his conduct was unlawful. *Payne v. Britten*, 749 F.3d 697, 708 (8th Cir. 2014) (citation omitted). Thus, the Court finds that Officer Marzolf is entitled to qualified immunity on Ms. Pollreis' excessive force claim.

### C. Claims Against Officer Kirmer

Ms. Pollreis alleges that Officer Kirmer is also responsible for the unconstitutional acts against her and her children. Officer Kirmer argues that he did not directly participate in the alleged constitutional violations, so Ms. Pollreis' claims against him must be dismissed as a matter of law.

Assuming that Officer Kirmer's order caused Officer Marzolf to prolong the detention of W.Y. and S.Y., the Court concludes that, based upon the facts *known to Officer Kirmer*, Officer Kirmer had an objectively reasonable suspicion that W.Y. and S.Y. were the fleeing suspects even if was mistaken. *See Hollins*, 685 F.3d at 706 ("'The determination of whether probable cause,' or reasonable suspicion, 'existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time.'") (quoting *Sanders*, 196 F.3d at 913). Officer Marzolf informed Officer Kirmer that he had stopped two juveniles and that they were wearing dark hoodies and pants. Also, after Officer Kirmer responded that one of the suspects would be shorter and skinnier than the other, Officer Marzolf said, "10-4." These were the facts known to

31

Officer Kirmer when he gave his third and final order to Officer Marzolf to detain W.Y. and S.Y. Officer Kirmer had no way of knowing that the size and height discrepancy between the boys was due to their prepubescence.

The Court notes that Officer Kirmer did not know that: (1) W.Y. and S.Y. had not been running and were not out of breath; (2) W.Y. and S.Y. complied immediately with Officer Marzolf's commands; (3) the age of the boys; and (4) the age of the boys and their alibis had been vouched for by their mother and stepfather. If he had known these facts, the Court's analysis would be different. As the record stands, however, the Court concludes that a reasonable officer in Officer Kirmer's shoes would have had reasonable suspicion that supported ordering Officer Marzolf to stop W.Y. and S.Y. The Court therefore grants Officer Marzolf summary judgment on the illegal seizure claim against him.

Finally, the Court finds that Officer Kirmer is entitled to summary judgment on the remaining claims against him. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Parrish, 594 F.3d at 1001 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)). The record is devoid of any evidence of a causal connection between Officer Kirmer's order to Officer Marzolf and Officer Marzolf's decision to search, arrest, or excessively use force against Ms. Pollreis or her children. Accordingly, the Court dismisses all of the illegal search, illegal arrest, and excessive use of force claims against Officer Kirmer.

## IV. CONCLUSION

The Court's rulings are summarized in this table:

| Claim | Current Status of the Claim for Trial |
|---|---|
| **Cause of Action 1 against Officer Marzolf** <br><br> Illegal Seizure of W.Y. and S.Y. | As to the **initial seizure** of W.Y. and S.Y., summary judgment on the merits of this claim is granted. <br><br> As to the **prolonged seizure** of W.Y. and S.Y., summary judgment on the merits of this claim is denied and qualified immunity is denied. |
| **Cause of Action 2 against Officer Marzolf** <br><br> Illegal Arrest and Detention of W.Y. and S.Y. | Summary judgment on the merits is denied and qualified immunity is denied. |
| **Cause of Action 3 against Officer Marzolf** <br><br> Illegal Search of W.Y. and S.Y. | As to the **frisk of W.Y.**, summary judgment on the merits is denied and qualified immunity is denied. <br><br> As to the **frisk of S.Y. and the backpack search**, summary judgment is granted. |
| **Cause of Action 4 against Officer Marzolf** <br><br> Use of Excessive Force Against W.Y. and S.Y. | Summary judgment on the merits is denied and qualified immunity is denied. |

| Cause of Action 5 against Officer Marzolf<br><br>Use of Excessive Force Against Ms. Pollreis | Qualified immunity is granted. |
| --- | --- |
| **All Causes of Action Against Officer Kirmer** | Summary judgment is granted on all claims against Officer Kirmer. |

**IT IS THEREFORE ORDERED** that Officer Marzolf and Officer Kirmer's Motion for Summary Judgment (Doc. 20) is **GRANTED IN PART AND DENIED IN PART**. All of the claims against Officer Kirmer are **DISMISSED WITH PREJUDICE**. The following claims against Officer Marzolf are **DISMISSED WITH PREJUDICE**:

- As to Count One of the Complaint, the claim based upon the initial seizure of W.Y. and S.Y.;

- As to Count Three of the Complaint, the claim based upon the frisk of S.Y. and the backpack search;

- All of Count Five of the Complaint;

The following claims against Officer Marzolf, however, **remain pending** for trial:

- As to Count One of the Complaint, the claim based upon Officer Marzolf's prolonged seizure of W.Y. and S.Y.;

- All of Count Two of the Complaint;

- As to Count Three of the Complaint, the claim based upon the frisk of W.Y.;

- All of Count Four of the Complaint.

**IT IS SO ORDERED** on this __13th__ day of March, 2020.

_____

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE